**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **SHANTELA STACKHOUSE, Individually, and as Independent Administrator of the Estate of C.M.,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 3:22-CV-246-NJR** |
| **UNITED STATES OF AMERICA,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff Shantela Stackhouse ("Ms. Stackhouse") was 39 weeks and four days pregnant with a healthy baby when she went to Alton Memorial Hospital ("AMH") in July 2019 with complaints of pain, cramping, and contractions. Medical professionals at AMH determined Ms. Stackhouse was not in labor, and she was discharged home. Within hours, Ms. Stackhouse's unborn son died due to a placental abruption.

Ms. Stackhouse filed this medical malpractice action on behalf of herself and her deceased son, C.M., on July 21, 2021, in the Circuit Court of Madison County, Illinois, against AMH, Diane M. Lahey, RN ("Nurse Lahey"),[1] Southern Illinois Healthcare Foundation ("SIHF"), and Geoffrey Turner, M.D.[2] (Doc. 3-1). The United States of

---

[1] Nurse Diane Lahey is now known as Diane Baumgartner. The Court will refer to her as "Nurse Lahey" for consistency with the medical record. Both AMH and Diane Lahey settled Plaintiff's claims against them and were voluntarily dismissed with prejudice. (*See* Doc. 95).

[2] Ms. Stackhouse also named Dr. Jamie L. Hardman as a defendant but ultimately abandoned her claim against Dr. Hardman.

America removed the action to federal court on February 11, 2022, due to SIHF and

Dr. Turner being deemed federal employees under the Federally Supported Health

Centers Assistance Act, 42 U.S.C. §233(g)-(n). (Doc. 3). This Court, therefore, has subject

matter jurisdiction pursuant to 28 U.S.C. §§ 1346(b) and 2671, *et seq.* On March 28, 2022,

the Court dismissed SIHF and Dr. Turner with prejudice and substituted the United

States of America in their stead. (Doc. 21).

Plaintiff is now proceeding on two counts of the Third Amended Complaint.[3]

(Doc. 96). Count I alleges medical malpractice against the United States due to the

negligence of Dr. Turner, purportedly causing personal injury to Ms. Stackhouse.

Count II alleges wrongful death against the United States due to the negligence of

Dr. Turner, purportedly causing the death of C.M.

The Court held a bench trial on April 22, 2025, and now makes the following

findings of fact and conclusions of law.

FINDINGS OF FACT

I.    <u>Events of July 23, 2019</u>

Ms. Stackhouse was born in January 1987 and grew up in East St. Louis, Illinois.

(Doc. 140 at p. 113). On the morning of July 23, 2019, Ms. Stackhouse, who was 39 weeks

and four days pregnant with her third child, C.M., began feeling a little nauseated. (*Id.* at

p. 120). She vomited and started to feel contractions and cramping. (*Id.*). Ms. Stackhouse

initially was going to wait a little bit, but ultimately decided to go to the Women's Clinic

---

[3] The Court dismissed Count III on February 18, 2025. (Doc. 130).

at AMH because she didn't know who would be delivering her baby. (*Id.* at p. 121). Ms. Stackhouse knew her primary OB-GYN, Dr. Jamie Hardman, was on maternity leave herself, so the on-call doctor would deliver her baby. (*Id.* at pp. 118-19).

When Ms. Stackhouse arrived at AMH around 9:35 a.m., she was greeted by a nurse who informed her "that everybody decided to have their children today." (*Id.* at p. 122). Ms. Stackhouse was placed in a room where Nurse Lahey initiated a triage protocol, which included taking the patient's history, symptoms, and complaints. (*Id.* at pp. 29, 72, 73). Nurse Lahey had no prior experience with Ms. Stackhouse and had no knowledge of her medical history. (*Id.* at p. 28). At that time, Nurse Lahey had an associate's degree in nursing and had worked as a registered nurse for almost two and a half years. (*Id.* at p. 24). Nurse Lahey had worked in the obstetrics department for approximately 22 months and had no advanced training in obstetrics. (*Id.* at pp. at 23-25).

Nurse Lahey took Ms. Stackhouse's prior medical history, symptoms, and complaints, and asked about any history of preeclampsia. (*Id.* at pp. 74, 124, 139). Ms. Stackhouse told Nurse Lahey that she experienced preeclampsia with her first child, but Nurse Lahey did not document this history. (*Id.* at pp. 74, 89, 139).

Following the standard protocol in the Labor and Delivery Unit, Nurse Lahey monitored Ms. Stackhouse's blood pressure, checked her cervix for changes, acquired a urine sample for a urinalysis, and applied an electronic fetal monitor ("EFM") that records contraction patterns and fetal heart rate. (*Id.* at p. 26). Ms. Stackhouse's blood pressure was recorded two times, 30 minutes apart. The first reading at 10:05 a.m. was 140/98, and the second reading at 10:35 a.m. was 131/90. (Ex. 9). Nurse Lahey testified

the two blood pressure readings were moderately high. (Doc. 140 at p. 35). The urinalysis
also revealed several abnormal findings: Ms. Stackhouse's urine was cloudy, it contained
2+ protein (also referred to as proteinuria), it contained trace blood, and it contained 2+
leukocyte esterase. (*Id.* at p. 37; Ex. 100). Two sterile vaginal exams performed slightly
more than an hour apart revealed no change in the dilation of Ms. Stackhouse's cervix,
indicating she was not in labor. (Ex. 113 at pp. 106-07). The EFM indicated frequent
contractions, and Nurse Lahey testified that Ms. Stackhouse was contracting every one
to two minutes, which is "a lot." (Doc. 140 at p. 45).

Ms. Stackhouse's pain and cramping worsened after she arrived at AMH and
continued to intensify. (*Id.* at pp. 124-25). She testified that she felt pain she never
experienced in either of her prior pregnancies. (*Id.* at p. 125). Ms. Stackhouse described it
as the worst pain she had ever felt in her life, despite previously giving birth twice
without an epidural. (*Id.* at p. 144). Although she kept ringing for the nurses and
requesting pain medication, they did not provide any. (*Id.* at pp. 142, 143). And while
Nurse Lahey charted Ms. Stackhouse's pain as 4 out of 10, which may have been true
when she first arrived at the hospital, Ms. Stackhouse testified that the excruciating pain
was beyond a 10 by the time she left AMH. (*Id.* at pp. 143-45).

Nurse Lahey testified that, between 9:40 a.m. and 11:20 a.m., the EFM strip was
reliable in that it showed C.M.'s heart rate was within the acceptable range for a healthy
baby. (*Id.* at pp. 43-48; Ex. 110). Between 11:20 a.m. and 11:29 a.m., the EFM strip showed
that the baby's baseline heart rate was decreasing. (*Id.* at p. 49; Ex. 110). But since the
baseline heart rate was still between 110 and 160, it was within an acceptable range. (*Id.*).

When asked whether the EFM strip showed heart rate decelerations or contraction patterns that concerned Nurse Lahey, she testified "it's hard to determine." (*Id.*).

At 11:38 a.m., the EFM strip showed another fetal heart rate deceleration, but because it occurred at the same time as a contraction, it was not as concerning to Nurse Lahey. (*Id.* at pp. 50-51; Ex. 110). She explained that a deceleration that mimics a contraction could be due to head compression, not because there's anything wrong with the fetus. (*Id.* at p. 51).

At 11:40 a.m., Nurse Lahey called Dr. Turner, the on-call OB-GYN for AMH's Labor and Delivery Unit about a "labor check." (*Id.* at p. 39). At trial, Nurse Lahey did not have an independent recollection of her call with Dr. Turner, but testified she would have given him a standard report including the patient's name, physician, number of pregnancies and deliveries, gestational age, and any "findings." (*Id.*). This was her "standard of care and what [she] report[s] out to every physician every time." (*Id.* at p. 56).

> Nurse Lahey was shown a Nursing Note that she wrote at 11:59 a.m., which stated:
>
> Patient to L&D with complaints of cramps and contractions. Patient placed on EFM and cervix checked. SVE: 2/thick/-4 and UA sent. Patient rechecked after over an hour with same exam. Dr. Turner called with results and gave orders for Macrobid and d/c patient home. Patient signed discharge orders and ambulated out of department without difficulty.

(Ex. 100 at AMH00018). Nurse Lahey testified that "Dr. Turner called with results" would include results of the EFM tracing, urinalysis results, blood pressures, and the sterile vaginal exams. (Doc. 140 at p. 57). With respect to the urinalysis results, Nurse Lahey testified she would have communicated "all abnormal findings" including the 2+ protein.

(*Id.* at p. 58). In July 2019, Nurse Lahey would have recognized 2+ protein as being relevant. (*Id.* at pp. 37-38). At that time, Nurse Lahey did not understand the relevance of a 2+ leukocyte esterase in a 39-week pregnant woman, so she would "just report it as abnormal" to the on-call physician. (*Id.* at p. 38). This is the type of information Nurse Lahey "always, as part of [her] custom, practice, training, and education . . . would have relayed to a physician." (*Id.*).

Nurse Lahey explained that Dr. Turner does not have access to the EFM strip himself and relies on what she tells him. (*Id.*). She acknowledged, however, that she did not report any abnormalities on the EFM strip to Dr. Turner, including the fact that the strip displayed tachysystole,[4] *i.e.*, that Ms. Stackhouse was contracting every one to two minutes, or that the strip showed a fetal heart rate deceleration prior to her call with Dr. Turner. (*Id.* at pp. 82-83).

Nurse Lahey also agreed her note did not mention Ms. Stackhouse's prior medical history of preeclampsia, her reports of pain, vital signs, proteinuria, inadequate or broken tracing on the EFM strip, or vomiting. (*Id.* at pp. 88, 89, 90, 98). She further acknowledged the note does not mention whether any of these items were communicated to Dr. Turner. (*Id.*at pp. 90, 91). Nurse Lahey testified, however, that the note was merely "an entry in the flow sheet about the phone call being done, not what was said during the phone call." (*Id.* at p. 54).

Dr. Turner has been a board-certified OB-GYN since 2000 and has been licensed

---

[4] Tachysystole is defined as five or more contractions in a 10-minute period averaged over 30 minutes and can be a risk factor for placental abruption. (Ex. 111 at pp. 46, 65).

to practice in Illinois for approximately 28 years. (*Id.* at pp. 163-64). He estimated he has delivered more than 4,000 babies over the course of his career. (*Id.* at p. 164). On July 23, 2019, Dr. Turner was in his office seeing patients and was serving as the on-call obstetrician for any patients that came into the Labor and Delivery Unit that day. (*Id.* at pp. 167-68). His office is on the AMH campus but in a separate building from the hospital. (*Id.* at p. 167). Dr. Turner testified that at least 90 percent of the calls he receives on any 24-hour on-call shift are from labor and delivery nurses like Nurse Lahey regarding labor checks. (*Id.* at p. 170). He explained that a "labor check" is when a patient presents at the hospital and questions whether she is experiencing active labor or false labor. (*Id.* at pp. 170-71).

Dr. Turner testified that it is the nurse who decides whether a patient is presenting for a labor check. (*Id.* at p. 171). He described the labor and delivery nurse's role as the "frontline person" who takes in all information and distills that information down to what she thinks is relevant, then she passes that information on to the on-call obstetrician. (*Id.*). Dr. Turner testified that he relies on the information provided by the on-call nurse, as she's the only person in the hospital with the patient. (*Id.* at p. 172).

Dr. Turner had access to patients' prenatal records through his computer, but he did not have direct access to hospital records. (*Id.* at pp. 180, 190). Thus, while Dr. Turner could see Ms. Stackhouse's prenatal care records, he could not access her current blood pressure readings, urinalysis results, or EFM strip. (*Id.* at p. 181). Ms. Stackhouse had 14 prenatal visits at SIHF. (Ex. 1). At Ms. Stackhouse's first visit on November 29, 2018, Dr. Hardman noted: "OB history significant for pre-eclampsia with post-partum

hemorrhage and blood transfusion during first vaginal delivery." (*Id.* at p. 71).

According to Dr. Turner, Nurse Lahey called him around 11:40 a.m. on July 23, 2019, stating that she was with a patient of Dr. Hardman. (*Id.* at p. 174). She told Dr. Turner that the patient was 32 years old, 39 weeks pregnant, "gravida 4, para 2, and that she had come in for contractions. She said her cervix was checked when she got here and she was too thick and long, it's been over an hour, and the cervical recheck did not demonstrate any change." (*Id.* at pp. 174-75). Nurse Lahey then told Dr. Turner that she sent a urinalysis down to the lab and "it looks like she has a UTI." (*Id.*).

Dr. Turner testified that he understood Nurse Lahey was calling for a labor check, a common obstetric consultation. (*Id.* at p. 176). He continued: "The cervix had not changed to show that she was in labor, so it seemed like a very concise labor check explanation with the addition of the urinary tract infection being thrown in there." (*Id.*). According to Dr. Turner, Nurse Lahey did not tell him anything about Ms. Stackhouse's vital signs, blood pressure readings, the EFM strip, or any specific information about the urinalysis except that she had a UTI. (*Id.* at p. 179). He further stated that "[i]f the nurse doesn't mention something to me as abnormal then I will take it that it is normal." (*Id.* at p. 180). Dr. Turner summarized the call with Nurse Lahey as "a very clear and focused labor check with no red flags." (*Id.*).

Based on the information provided by Nurse Lahey, Dr. Turner formulated a differential diagnosis as to Ms. Stackhouse: "is she in labor, and does she have a urinary tract infection." (*Id.* at p. 182). He concluded that no, she was not in labor, and yes, she had a UTI. (*Id.*). Preeclampsia was not on his differential diagnosis because no concerning

information, like elevated blood pressure or proteinuria, was communicated to him. (*Id.*).

Therefore, he told Nurse Lahey to give Ms. Stackhouse a week of Macrobid for the UTI,

and "if the strip was reactive, then she could go home." (*Id.* at p. 177). Macrobid is a

common antibiotic given for UTIs, especially in pregnant women. (*Id.*). Nurse Lahey told

him "Okay, thanks." (*Id.*). By "reactive," Dr. Turner meant that "the fetal heart tracing

should have 15-beat-per-minute acceleration for over 15 seconds twice in a 20-minute

period." (*Id.*). Dr. Turner did not specify whether the instruction to allow Ms. Stackhouse

to go home if the "strip was reactive" meant before the call with him or after the call with

him. (*Id.* at p. 199).

Nurse Lahey, on the other hand, testified that she did not tell Dr. Turner that

Ms. Stackhouse had a UTI. (*Id.* at p. 84). She testified that nurses are not allowed to make

a diagnosis, she has never been allowed to make a diagnosis in her career, and she did

not diagnose Ms. Stackhouse. (*Id.* at pp. 26-27). Nurse Lahey agreed that she does not

have the necessary training and experience to make a diagnosis. (*Id.* at p. 27). According

to Nurse Lahey, only physicians like Dr. Turner and mid-level practitioners are permitted

to make diagnoses. (*Id.*). Nurse Lahey was then impeached with prior deposition

testimony in which she was asked whether she would have used the word "UTI" with

Dr. Turner. She answered, "Possibly. I don't recall." (*Id.* at pp. 84-85).

The last six minutes of Ms. Stackhouse's EFM strip occurred after the phone call

with Dr. Turner. (*Id.* at p. 94). Nurse Lahey agreed this portion of the strip was "utterly

unreliable." (*Id.* at p. 51). Nurse Lahey testified that the strip showed a baseline that was

indeterminate as to whether the tracing was fetal, maternal, or artifact. (*Id.* at pp. 40-41,

95). She agreed this portion of the strip had inconsistent tracing around 65 to 70 heartbeats per minute, which is a precipitous decline from what one wants to see in a fetal heart rate (*Id.* at p. 96). Nurse Lahey also agreed she could have used a pulse oximeter to determine whether the heartrate was maternal or fetal, yet she did not do so. (*Id.* at p. 97). She acknowledged that, if it were the fetal heart rate, it meant the baby was in serious distress—making it a "nonreactive strip." (*Id.* at p. 99).

Nurse Lahey attributed the unreliable results to the fact that Ms. Stackhouse had begun vomiting. (*Id.* at pp. 101-02). Nurse Lahey explained that when a patient is sitting up, it can cause the EFM to pick up artifact such that it is unreliable. (*Id.* at 101-04). Ordinarily, Nurse Lahey would place the patient back on the monitor when a strip is indeterminate, but she did not want to lay Ms. Stackhouse back down while she was vomiting. (*Id.* at p. 51). There is no documentation in the AMH chart that Ms. Stackhouse vomited. (*Id.* at p. 98). Ms. Stackhouse did not recall vomiting at AMH, but instead remembered sitting up and "dry heaving." (*Id.* at p. 126).

Nurse Lahey did not call Dr. Turner back to tell him about the last, unreliable portion of the EFM strip or that Ms. Stackhouse had begun vomiting. (*Id.* at p. 100). She testified that nothing on the EFM strip required a second call to Dr. Turner. (*Id.* at p. 108). Nurse Lahey told Ms. Stackhouse she could leave the hospital. (*Id.* at p. 88). Ms. Stackhouse could still feel C.M. moving at the time she was discharged. (*Id.* at p. 129).

After Ms. Stackhouse was discharged, she went home, took Tylenol, and must have "passed out" because she does not remember much of anything after that. (*Id.* at pp. 129-31). She recalled trying to wake up, but she could barely move. (*Id.* at p. 130). She

yelled for her teenage daughter, Arrieiona, to call 911. (*Id.*). Ms. Stackhouse remembers thinking that she and C.M. were "in trouble" as the EMTs on the ambulance were moving her, trying to keep her awake, and telling her to "stay with us, stay with us." (*Id.*). The ambulance took her to Gateway Regional Hospital in Granite City, Illinois, where doctors performed an emergency caesarean section ("C-section"). (*Id.* at p. 131). C.M. was pronounced dead at 4:16 p.m. (Doc. 135 at p. 4). The cause of death was placental abruption. (*Id.*).

Dr. Turner testified that he has a "very clear memory" of his call with Nurse Lahey because, the following morning, he learned that Ms. Stackhouse had lost her baby. (*Id.* at p. 178). The Labor and Delivery Unit Manager asked him to recount his conversation with Nurse Lahey, and in 30 years he has only had six patients lose a full-term baby. (*Id.*). Thus, it was a "memorable moment" for him. (*Id.*).

Nurse Lahey did not know that Ms. Stackhouse delivered her baby stillborn until she was served with this lawsuit about two years later. (*Id.* at pp. 102, 110). Nurse Lahey does not recall Dr. Turner or anyone else approaching her to discuss any nursing care and treatment or nursing practices in light of C.M's death. (*Id.* at pp. 110-11).

## II.    Standard of Care Testimony

### A.    *Dr. Turner*

Dr. Turner testified that he is familiar with the definition of standard of care: what a reasonably careful on-call obstetrician would do under the same or similar circumstances. (Doc. 140 at p. 183). In this case, he testified, the standard of care did not require him to consult Ms. Stackhouse's prenatal chart, the acute AMH chart, or the EFM

strip because "the question was very specific as to was she in labor or not and did she have a urinary tract infection." (*Id.* at p. 184). Dr. Turner testified that the standard of care also did not require him to personally meet with Ms. Stackhouse or ask any questions of Nurse Lahey about Ms. Stackhouse because "there were no red flags or things to ask questions about." (*Id.*). In fact, he testified, the standard of care did not require him to "do anything beyond determining whether Ms. Stackhouse was in labor and responding to the UTI." (*Id.* at p. 185). Dr. Turner stated that he believed he met the standard of care in this case. (*Id.*).

Dr. Turner also stated that if Nurse Lahey had, as she claimed, told him about the 2+ protein in Ms. Stackhouse's urine, he would have asked Nurse Lahey about her blood pressure readings. (*Id.*). Dr. Turner agreed that if he had asked, Nurse Lahey would have given him a correct reading of Ms. Stackhouse's vital signs. (*Id.* at p. 204-05). And if he found out Ms. Stackhouse's blood pressure also was elevated, he would have ordered a series of preeclampsia labs. (*Id.* at p. 186). Moreover, had he known that Ms. Stackhouse was in worsening, excruciating pain, he would have gone to see her. (*Id.*).

After he learned that Ms. Stackhouse's baby died, Dr. Turner did not go to speak with Nurse Lahey or ask what happened. (*Id.* at p. 188). He looked at the medical records because he asked the nurse manager "if the strip was okay [and] she said it was okay." (*Id.*). Dr. Turner also testified that he had received "several dozen" labor check calls from Nurse Lahey in the time they worked together, and he believed Nurse Lahey was competent to do her job on July 23, 2019. (*Id.* at pp. 173, 189). He could not explain why she did not tell him about Ms. Stackhouse's 2+ protein. (*Id.* at p. 189). Dr. Turner agreed

that if Nurse Lahey *had* told him about the 2+ protein and the elevated blood pressure readings, and he discharged Ms. Stackhouse anyway, "that would have been a problem." (*Id.*).

He also agreed that, as the on-call doctor, he was in charge of Ms. Stackhouse's care. (*Id.* at p. 196). As a reasonably careful on-call obstetrician, Dr. Turner would want as much information as he could get about the patient. (*Id.*). He acknowledged he could have asked for the patient's name if he thought that would be any help, and he could have looked at Ms. Stackhouse's prenatal records. (*Id.* at pp. 198, 203). He also could ask questions "if there was a red flag [he] needed to investigate." (*Id.* at p. 209). However, Dr. Turner did not consult the prenatal record available to him to determine Ms. Stackhouse's historic, baseline blood pressure. (*Id.* at pp. 203-04).

When asked whether a doctor has to exercise medical judgment before discharging a patient, Dr. Turner agreed that a doctor must "interpret everything that's been presented to him." (*Id.* at p. 205). In this case, he "had maybe incomplete information . . . but I assumed everything [Nurse Lahey] gave me was correct." (*Id.*).

Dr. Turner also testified that he did not ask for Ms. Stackhouse's blood pressure readings or any pertinent positive findings in the urinalysis because:

> [Nurse Lahey] did provide me [with] the information. She told me that the patient had a UTI. She had not provided me anything about blood pressure or she had not provided me anything about specifics of the urinary—of the urinalysis. So, if she doesn't provide me with an abnormal, I will have the belief that that is, therefore, normal.

(*Id.* at p. 206).

Dr. Turner agreed that Nurse Lahey ran the tests on Ms. Stackhouse and was the

only person who reviewed the results of those tests. (*Id.* at 213-14). Nurse Lahey then called and said Ms. Stackhouse had a UTI. (*Id.* at 214). When asked whether Nurse Lahey "came up with the diagnosis, not you," he responded that "[s]he suggested one, yes." (*Id.*). Dr. Turner agreed that he did not come up with an independent diagnosis "because what she had presented was consistent." (*Id.*).

Dr. Turner agreed that Nurse Lahey provided him with information but he did not ask her any questions. (*Id.*). Dr. Turner further testified that if a nurse says a patient is there for a labor check, she fails to tell him vitals, she fails to give any other pertinent information, and just simply says "I think she has a UTI," that the standard of care does not obligate him to ask a single question. (*Id.* at p. 222). If he were to ask more questions, "we are going to start fishing for other problems," which would be "much more complicated." (*Id.* at p. 236).

He described the nurse's role as that of information gatherer, and he is "the one who has to decide what to do with the information, the treatment of the urinary tract infection and letting the patient go because she had not shown signs of active labor." (*Id.* at p. 215). Dr. Turner then agreed that Nurse Lahey told him Ms. Stackhouse had a UTI and he "went along with it." (*Id.* at p. 215). He confirmed he did not independently try to find the urinalysis results or do anything to confirm this was, in fact, a UTI and not some other circumstance like preeclampsia. (*Id.* at pp. 215-16). Dr. Turner asserted that is still being a reasonably careful on-call obstetrician because nurses see hundreds of urinalyses and UTIs—letting him know the patient had a UTI is "just part of distilling the information for me." (*Id.* at p. 216).

B. *Becky Kaufman Lynn, M.D.*

Plaintiff presented the videotaped deposition of her retained expert, Dr. Becky

Kaufman Lynn, as her trial testimony. Dr. Lynn graduated medical school at Georgetown

University, completed her residency at Washington University in St. Louis in 2003, and

became a board-certified physician in OB-GYN and Obesity Medicine. (Exhibit 7 at pp. 6-

7). As a faculty member at the University of Missouri, Columbia, and Saint Louis

University, Dr. Lynn taught medical students and residents and taught at grand rounds.

(*Id.* at pp. 7-8). She practiced obstetrics for 20 years until January 20, 2020. (*Id.* at pp. 7-9).

She has not delivered a baby since then. (*Id.* at p. 56). She last attended a Continuing

Medical Education course concerning obstetrics more than 10 years ago and has not

taught on the subject of obstetrics since January 2020. (*Id.* at pp. 57, 59). Nearly 16 years

have passed since Dr. Lynn last practiced on-call obstetrics. (*Id.* at p. 72). Dr. Lynn

currently practices gynecology and obesity medicine and owns Evora Women's Health,

a concierge medical practice that does not offer or advertise obstetrical services (*Id.*). She

is a member of the American College of OB-GYN (ACOG). (*Id.* at p. 10).

During her time as an on-call obstetrician, Dr. Lynn relied upon and trusted

nursing staff to communicate salient information about a patient. (*Id.* at pp. 75, 77). But,

if information was missing, she would ask about it. (*Id.* at p. 74). She acknowledged an

OB-GYN can and should rely upon other trained healthcare professionals, including

nursing staff. (*Id.* at p. 76).

When Dr. Lynn was a practicing OB-GYN, she had "lots and lots of experience

dealing with preeclampsia." (*Id.* at p. 13). Dr. Lynn testified that the symptoms of

preeclampsia include, among other things, elevated blood pressure, proteinuria, headaches, right upper quadrant pain, and certain lab abnormalities. (*Id.*). Additionally, a woman with a history of preeclampsia in an earlier pregnancy is at a higher risk of developing preeclampsia again with a second or third pregnancy. (*Id.*).

Dr. Lynn explained that any time a patient has 2+ proteinuria, "you should immediately be thinking preeclampsia." (*Id.* at p. 25). Elevated blood pressure is also a "[b]ig red flag for preeclampsia," while the combination of proteinuria and elevated blood pressure "screams preeclampsia." (*Id.* at p. 26).

Dr. Lynn opined that if Nurse Lahey's version of the phone call—where she told Dr. Turner about Ms. Stackhouse's urinalysis results and blood pressure readings—was correct, then the standard of care required Dr. Turner to order further workup. (*Id.*). She further opined that the standard of care in that circumstance would impose a duty on Dr. Turner to ask about any pertinent positive findings on the urinalysis. (*Id.* at p. 28).

Dr. Lynn next considered Dr. Turner's version of the phone call, where Nurse Lahey told Dr. Turner the patient was presenting for a labor check, there were no cervical changes, and the patient had a UTI. (*Id.* at p. 29). Dr. Lynn agreed Dr. Turner could rely upon his longstanding relationship with the nursing staff at AMH and expect to be told a patient's vital signs and lab results if abnormal. (*Id.* at p. 141). Dr. Lynn opined that Dr. Turner still had an obligation to inquire further "[b]ecause basically the nurse made the diagnosis." (*Id.*). She further explained: "[T]he point of that exchange is for the nurse to take the information that she gathered from the doctor's orders . . . She's supposed to call the doctor with that information. And then the doctor makes the differential

diagnosis and comes up with a plan. But in this exchange, she called him with a diagnosis and he didn't ask anything about it. He took it at face value when he should have been making his own assessment." (*Id.* at pp. 29-30).

Dr. Lynn testified that a physician is required to diagnose a patient, and Dr. Turner did not diagnose Ms. Stackhouse before she was discharged; he did not even discuss the urinalysis results with Nurse Lahey. (*Id.* at p. 30). Instead, "what he got was already a diagnosis. She has a UTI. And he didn't ask anything else to confirm it was a UTI. How does Nurse Lahey know?" (*Id.* at p. 52). Dr. Lynn opined that Dr. Turner had a duty to ask the necessary questions regarding how Nurse Lahey reached her diagnostic conclusion from the urinalysis. (*Id.* at p. 54). Based on the limited information that Dr. Turner said Nurse Lahey told him, Dr. Lynn could not say to a reasonable degree of medical certainty that Ms. Stackhouse had a UTI. (*Id.* at p. 148). And, she opined, neither could Dr. Turner. (*Id.*). Yet, he accepted Nurse Lahey's diagnosis and ordered a prescription antibiotic. (*Id.*).

Dr. Lynn further agreed that Dr. Turner had a duty under the standard of care to ask about Ms. Stackhouse's prior history of preeclampsia or blood pressure issues, to confirm the lab results from the urinalysis including whether she had protein in her urine, and to draw the conclusion, the "working diagnosis," of why Ms. Stackhouse was there. (*Id.* at pp. 31-34).

Dr. Lynn thought it was relevant that Dr. Turner was at his desk, in his office, when Nurse Lahey called because, "sometimes on Labor and Delivery it gets crazy, you have an emergency, you're running to, you know, a room to deliver a baby or maybe

you're going back for a C-section and you might not have time to look at a strip or to review anything about a patient. But if you're sitting in your office, then you have time to look at the strip and to review the patient's chart." (*Id.* at p. 38). However, she acknowledged that she previously testified that Dr. Turner did not have a duty to review Ms. Stackhouse's prenatal records from the preceding months. (*Id.* at p. 89).

When Dr. Lynn looked at Ms. Stackhouse's EFM strip, she noted tachysystole, which she described as no relaxation period between contractions. (*Id.* at p. 40). She explained that tachysystole can be seen with placental abruption. (*Id.*). She also saw evidence of fetal heart rate deceleration, which is when the baby's heart rate drops below the baseline. (*Id.* at pp. 42-43).

Dr. Lynn opined that a reasonably careful OB-GYN who had seen the EFM strip with decelerations, tachysystole, and absent data on the last four minutes, with a patient who is 39 weeks pregnant with severe pain and cramping, would have placental abruption on his differential diagnosis. (*Id.* at pp. 44-45). Adding in the 2+ proteinuria and the two elevated blood pressure readings, Dr. Lynn testified, a reasonably careful OB-GYN would, at a minimum, keep the patient and not let her go home. (*Id.* at p. 45). And if the nurse did not relay the vital signs, EFM strip findings, contraction patterns, and lab or urinalysis results, the standard of care places a duty on the doctor to ask for that information, review the EFM strip, and make a diagnosis based on all of the information. (*Id.* at pp. 47-48, 50. 156). Dr. Lynn testified that the failure to do those things is a violation of the standard of care. (*Id.* at p. 50).

Even if Dr. Turner had inquired only about Ms. Stackhouse's blood pressure,

Dr. Lynn testified, that alone would have been enough for him to order further workup.

His failure to do so was a violation of the standard of care because he "took the diagnosis

made by [Nurse Lahey], didn't ask for any more information to make his own diagnosis,

and ultimately missed a major diagnosis." (*Id.* at p. 47).

Dr. Lynn understood, however, that Nurse Lahey admitted she never reported

Ms. Stackhouse's extreme pain, tachysystole, fetal heart rate decelerations, or any notable

change in the fetal monitoring strip to Dr. Turner. (*Id.* at pp. 108, 115, 116, 143). And, there

is nothing in the AMH chart to indicate Nurse Lahey informed Dr. Turner of

Ms. Stackhouse's prior history of preeclampsia, her vital signs, or her lab results. (*Id.* at

pp. 90, 93, 95, 108, 110, 111, 115, 116, 142). Dr. Lynn agreed Nurse Lahey did not

appreciate preeclampsia as a concern for Ms. Stackhouse. (*Id.* at p. 117). Nevertheless, if

Nurse Lahey did not provide Dr. Turner with Ms. Stackhouse's vitals or urinalysis

results, Dr. Lynn testified, Dr. Turner should not have assumed they were within normal

limits. (*Id.* at p. 126, 128). Instead, the doctor should have asked what the results were.[5]

(*Id.* at p. 127).

Dr. Lynn had no opinion as to whether it was more probably true than not that

Ms. Stackhouse suffered a placental abruption before she left AMH. (*Id.* at p. 46). She did

---

[5] The United States attempted to impeach Dr. Lynn with her prior deposition testimony, where she was asked similar questions. In her deposition, Dr. Lynn agreed that, if Dr. Turner was not told anything about Ms. Stackhouse's vital signs and lab results, he could presume they were normal. (*Id.* at pp. 127-28). The question about lab results at trial, however, was slightly different than the question asked in Dr. Lynn's deposition. In her deposition, defense counsel asked if it is reasonable for Dr. Turner to presume the patient's lab results were within normal limits if "no *abnormal* results were communicated to him." (*Id.* at pp. 128-29). Dr. Lynn's answer was yes. In this case, however, Nurse Lahey must have communicated an abnormal result to Dr. Turner because he prescribed Macrobid. In this situation, according to Dr. Lynn's trial testimony, Dr. Turner should not have assumed the lab results were within normal limits.

opine that, had Ms. Stackhouse been admitted and additional tests completed, it is more probably true than not that C.M. would have been born without complication. (*Id.* at p. 55). Furthermore, Dr. Lynn testified, it is more probably true than not that the failures of Dr. Turner resulted in C.M.'s death. (*Id.*).

C. *Casey Younkin, M.D.*

The United States presented Casey Younkin, M.D., as a retained expert. Dr. Younkin attended medical school at Washington University in St. Louis and completed a four-year residency program in obstetrics and gynecology at Barnes Hospital in St. Louis. (Ex. 113 at p. 6). He has been a board-certified OB-GYN since 1989 and licensed to practice medicine in Illinois since 1988. (*Id*. at pp. 7-8). Dr. Younkin has been employed by Southern Illinois University School of Medicine since 2003, where he is an associate professor in the OB-GYN department. (*Id.* at p. 8). Dr. Younkin has served as an on-call obstetrician, approximately once a week, since he began practicing in 1988. (*Id.* at p. 12). Plaintiff does not object to Dr. Younkin being recognized as an expert in obstetrics and on-call obstetrical practice. (*Id.* at p. 16).

Dr. Younkin offered two standard-of-care opinions: (1) Dr. Turner acted within the standard of care as to Ms. Stackhouse; and (2) Nurse Lahey fell below the standard of care as to Ms. Stackhouse. (*Id.* at p. 16).[6]

Dr. Younkin testified that it is generally the nurse who determines whether a patient is presenting for a labor check. (*Id.* at p. 14). The nurse will see the patient, take

---

[6] As discussed below, the Court overrules Plaintiff's objection to Dr. Younkin testifying that Nurse Lahey violated the standard of care.

her vital signs, examine the patient, reexamine the patient to determine if she's in labor, and then relay that information to an attending physician. (*Id.* at pp. 14-15). He described the labor and delivery nurse as the doctor's eyes and ears, and he testified that the doctor is entitled to rely upon the information provided by the nurse. (*Id.* at p. 19). A doctor also has the right to take the nurse's information as complete and true if it is coherent and believable. (*Id.* at p. 20). When Dr. Younkin receives a call from a nurse for a labor check, the nurse does not tell him the patient's vital signs, urinalysis lab results, or EFM strip results because "they're not part of the picture." (*Id.* at p. 21). In the absence of a nurse telling him this information, he assumes the results are normal. (*Id.*).

In this case, Dr. Younkin read Nurse Lahey's note regarding her call to Dr. Turner as a labor check. (*Id.* at pp. 24, 108). The patient came in complaining of cramps and contractions, she was monitored, and her cervix was checked twice. (*Id.* at p. 24). Dr. Younkin observed nothing in the note that would suggest Nurse Lahey told Dr. Turner about Ms. Stackhouse's medical history, reports of pain, vital signs, blood pressure, tachysystole, fetal heart decelerations, or proteinuria. (*Id.* at pp. 25-26). There was nothing communicated to Dr. Turner that would place preeclampsia on the differential. (*Id.* at p. 34). Dr. Younkin opined that it was reasonable, as an on-call obstetrician, for him to understand Ms. Stackhouse was presenting for a labor check. (*Id.*).

In the context of a labor check, Dr. Younkin testified that the standard of care does not require an on-call obstetrician to review a patient's prenatal chart unless the labor and delivery nurse presents information "that makes it possible the patient has other issues, a chronic disease, perhaps, or she's on medication." (*Id.* at pp. 36-37). In this case,

there was no reason for Dr. Turner to consult Ms. Stackhouse's contemporaneous medical
chart. (*Id.* at p. 38).

Additionally, Dr. Younkin testified, the standard of care does not require an on-call obstetrician to ask questions of a labor and delivery nurse who calls him "as long as the information seems to be complete -- and correct and coherent." (*Id.* at p. 39). When asked whether Dr. Turner had any reason to believe the information provided to him was "incorrect, irrelevant, or incomplete," Dr. Younkin testified that the information "seemed completely believable and coherent." (*Id.* at p. 40). He further opined that the standard of care did not require anything of Dr. Turner "beyond determining whether Ms. Stackhouse was in labor and responding to the report of a UTI." (*Id.* at p. 40). He added that an on-call physician "can fully expect that a labor and delivery nurse who's working at a hospital . . . can reasonably expect that that nurse is qualified enough to be able to present a patient coming in with obstetrical issues." (*Id.* at p. 69). Dr. Younkin testified Dr. Turner and Nurse Lahey's prior working relationship of 22 months was sufficient time for Dr. Turner to adequately rely upon the information communicated by Nurse Lahey. (*Id.* at p. 111).

Dr. Younkin testified, to a reasonable degree of medical certainty, that Ms. Stackhouse had a UTI on July 23, 2019, based on the urinalysis that was provided, and that the proteinuria was caused by the UTI. (*Id.* at p. 35). He also testified, however, that there are different causes of proteinuria. (*Id.* at p. 42). Ms. Stackhouse never met the objective clinical criteria for preeclampsia. (*Id.*).

As to Nurse Lahey, Dr. Younkin testified that, under the standard of care

governing a labor and delivery nurse, Ms. Stackhouse's reports of excruciating pain
should have been communicated to Dr. Turner and recorded in the AMH chart. (*Id.* at
pp. 44, 115). Additionally, Nurse Lahey violated the standard of care when she failed to
tell Dr. Turner about the tachysystole, fetal heart decelerations, proteinuria, and
Ms. Stackhouse's elevated blood pressure readings. (*Id.* at pp. 45-47, 51, 52, 111, 112). With
respect to Nurse Lahey's testimony that Ms. Stackhouse began vomiting after the call to
Dr. Turner, she should have continued monitoring Ms. Stackhouse. (*Id.* at p. 48).
Dr. Younkin added that if Dr. Turner had known of the blood pressure readings, as Nurse
Lahey testified, he should have kept the patient in the hospital and there would have
been a different outcome for Ms. Stackhouse and C.M. (*Id.* at pp. 42, 51, 56). He agreed
that, if Nurse Lahey's version of the phone call is to be believed, then Dr. Turner violated
the standard of care by discharging Ms. Stackhouse. (*Id.* at pp. 55-56).

   Dr. Younkin also confirmed that the last portion of the EFM strip was nonreactive
and non-reassuring. (*Id.* at p. 49). Allowing Ms. Stackhouse to leave the hospital not only
was a violation of Dr. Turner's express instructions, but fell below the nursing standard
of care. (*Id.* at pp. 49-50).

   It is Dr. Younkin's opinion that Dr. Turner did not violate the standard of care with
respect to Ms. Stackhouse. (*Id.* at pp. 53-54). He testified that a reasonably careful doctor
does not need to ask the nurse for any significant positive test results or look at the
patient's chart. (*Id.* at p. 82). Instead, a nurse is a healthcare professional who is allowed
to "collect information" and "make conclusions." (*Id.* at p. 60). According to Dr. Younkin,
a nurse can make a diagnosis, and Dr. Turner relied on Nurse Lahey's diagnosis of a UTI.

(*Id.* at pp. 76, 90). He believes "a nurse is fully qualified to look at the results of a urinalysis and declare that this is a UTI or bladder infection." (*Id.* at p. 77). He also testified that Dr. Turner made a diagnosis: "He could—he could go along with the diagnosis that she made and, thus, you know, make a diagnosis also or share in the diagnosis." (*Id.* at p. 78). Specifically, Dr. Turner "diagnosed this patient as not being in labor and as having a UTI. . . .The nurse, being his eyes and ears, gave him information and also synthesized some of that information . . . and he agreed with the analysis that she had made." (*Id.* at p. 79).

    D.  *Elizabeth Danielle Uchtman, R.N., B.S.N.*

The United States also presented the testimony of Elizabeth Danielle Uchtman, RN, BSN, as an expert in labor and delivery nursing. (Ex. 111). Ms. Uchtman was originally disclosed as Plaintiff's expert nurse to testify regarding Plaintiff's medical malpractice claim against Nurse Lahey and AMH. After Plaintiff settled with those parties, the United States tendered Ms. Uchtman's deposition in support of their sole proximate cause defense that Nurse Lahey was negligent in connection with her care and treatment.[7]

Ms. Uchtman is a licensed registered nurse in the State of Missouri who first obtained a nursing degree in 2006. (Ex. 108). She began her career in 2008 as a labor and delivery nurse. (*Id.*). Ms. Uchtman admitted she is not qualified to render an opinion on a physicians' standard of care, and she only looked at the nursing care in this case.

---

[7] Despite her original endorsement of Ms. Uchtman's testimony, Plaintiff now objects to such testimony being offered at trial but only on relevance grounds. (Doc. 140 at pp. 157, 158). The Court denies this objection as set forth below.

(Ex. 111 at p. 19).

Ms. Uchtman also testified that, as a nurse, she does not and cannot diagnose preeclampsia. (*Id.* at pp. 34). The plan of care for each patient is determined by the physician, and a diagnosis is also determined by the physician. (*Id.* at p. 41). The nurse's role is to look at the "entire picture," including the patient's complaints, labs, nursing assessment, and the EFM strip (*Id.* at p. 27). With regard to Ms. Stackhouse specifically, Ms. Uchtman testified that she did not know exactly what Nurse Lahey reported to Dr. Turner about the urinalysis results, but she knew that Dr. Turner had diagnosed a UTI because he prescribed medication. (*Id.* at p. 31).

Ms. Uchtman testified that the standard of care required Nurse Lahey to report the 2+ protein and Ms. Stackhouse's elevated blood pressure readings to Dr. Turner. (*Id.* at pp. 32-34). However, based on the records she reviewed, Ms. Uchtman believed Nurse Lahey did not report either the 2+ protein or the elevated blood pressures. (*Id.* at p. 32). Ms. Uchtman testified that the plan of care would have changed if Nurse Lahey had reported this information. (*Id.* at pp. 32-33).

Ms. Uchtman also testified that Ms. Stackhouse demonstrated tachysystole for the duration of her stay in triage. (*Id.* at p. 45). Nevertheless, Nurse Lahey had "an hour or so of a very reassuring tracing" before the baseline fetal heart tones appeared to go down to 100 or 105 beats per minute with moderate variability. (*Id.* at pp. 51-52). After that, the tracing was broken up and became unreliable. (*Id.* at pp. 53, 55). Ms. Uchtman explained that a nurse needs reliable and reassuring tracing before he or she decides to discontinue monitoring. (*Id.* at p. 57).

Ms. Uchtman further opined Nurse Lahey did not appropriately monitor Ms. Stackhouse and her baby, including by failing to readjust the fetal heart rate monitor when inconsistently graphing. (*Id*. at pp. 67, 68). With respect to the last portion of the EFM strip after the call to Dr. Turner, Ms. Uchtman opined a reasonably careful nurse would have placed a pulse oximeter on Ms. Stackhouse's finger and readjusted the monitor to determine whether the transcribed heart rate was maternal or fetal. (*Id*. at pp. 69, 70).

Ms. Uchtman opined that placental abruption can be demonstrated on fetal heart tracing. (*Id*. at p. 62). She testified that "a great example of what a placental abruption would look like on a strip" was present on Ms. Stackhouse's strip at 11:42 a.m. and thereafter. (*Id*. at p. 63). She acknowledged, however, that she did not know clinically what was happening at that time or if Ms. Stackhouse was still attached to the monitor at that point. (*Id*.).

According to Ms. Uchtman, Ms. Stackhouse ultimately had a placental abruption, and one of the risk factors for placental abruption is tachysystole. (*Id.* at p. 65). Ms. Stackhouse was also eventually diagnosed with HELLP syndrome, which is "the most severe form of preeclampsia." (*Id*.). Given that information, Ms. Uchtman opined that Ms. Stackhouse was demonstrating a placental abruption pattern, especially if she had no cervical changes. (*Id*.). While Ms. Uchtman was making her judgment based on hindsight, she noted that Nurse Lahey knew about Ms. Stackhouse's history of preeclampsia, the elevated blood pressures, the proteinuria, and the tachysystole. (*Id*. at p. 66).

Ms. Uchtman gave the opinion that the last section of the strip, which occurred after Nurse Lahey's call with Dr. Turner, depicted fetal heart rate and placental abruption. (*Id.* at pp. 73, 74). When combining the strip with the tachysystole, the 2+ protein, and the elevated blood pressure, Ms. Uchtman believed Ms. Stackhouse had a placental abruption before she left AMH. (*Id.* at p. 74). Ultimately, Ms. Uchtman opined that Nurse Lahey breached the standard of care as to Ms. Stackhouse, ultimately failing to provide appropriate obstetrical care. (*Id.* at pp. 19, 71).

### III.    <u>Ms. Stackhouse's Testimony</u>

Ms. Stackhouse testified live at trial. She told the Court she thought she did everything right to have a healthy pregnancy and baby. (Doc. 140 at p. 137). She had her room set up for C.M. with a bassinet, clothes, and "everything that you could imagine for a baby." (*Id.* at p. 134). After C.M.'s death, her family and friends packed everything up so she would not have to see it at home. (*Id.* at p. 135). She held a funeral for C.M., who would now be six years old. (*Id.*).

Ms. Stackhouse testified that C.M's death had an effect on her relationships with her other children. (*Id.* at pp. 134-35). When she first arrived home, she was a mess. (*Id.* at p. 135). She tried to think of things she could have done differently to keep C.M. alive and well. (*Id.*). The death of C.M. also impacted her pregnancy with her last child, "Z", significantly. (*Id.*). When she found out she was pregnant, she didn't know how to feel—happy or terrified—because of what she went through with C.M. (*Id.*).

Every year on July 23, the anniversary of C.M.'s death, Ms. Stackhouse does not know if she wants to get out of bed. (*Id.* at p. 136). Everybody tries to convince her she is

a strong woman, but she can't seem to convince herself. (*Id.*). She visits the cemetery, taking balloons and toys to leave at his gravesite. (*Id.*). Each time, she thinks she will get through the visit without breaking down, but she never does. (*Id.*). Not a day goes by that Ms. Stackhouse does not think about C.M. (*Id.* at p. 137).

## IV.    Additional Stipulations by the Parties

The parties stipulated that SIHF is an organization that employs physicians who provide care and treatment in several areas of medicine, including obstetrics and gynecology. (Doc. 135 at p. 2). At all relevant times, Dr. Turner, an OB-GYN, was an employee of SIHF and acted in the scope of his deemed employment with the U.S. Public Health Service. (*Id.*). Dr. Turner's medical license has never been suspended, investigated, and/or limited in any way. (*Id.*).

The medical care at issue concerns the decision to discharge Ms. Stackhouse from AMH on July 23, 2019. The parties agree that Ms. Stackhouse was never in active labor during her time at AMH on July 23, 2019. (*Id.* at p. 4). She did not meet the diagnostic criteria for preeclampsia and was never diagnosed with preeclampsia during her time at AMH on July 23, 2019. (*Id.*).

On July 24, 2019—one day after the events in question—Dr. Turner learned C.M. had passed away. (*Id.*). Meanwhile, Nurse Lahey did not learn C.M. had passed away until after service of this lawsuit in September 2021. (*Id.*).

On July 2, 2021, the Probate Division of the Circuit Court of Madison County, Illinois, appointed Ms. Stackhouse to be independent administrator of the Estate of C.M. (*Id.*).

Pursuant to the demands stated in Plaintiff's administrative tort claims, damages on her wrongful death claim may not exceed $15 million and damages on her personal injury claim may not exceed $15 million. (*Id.*). Additionally, in the event of an adverse verdict on any claim, the United States is entitled to and will be granted a setoff with regard to the confidential settlement paid by AMH in the full amount previously provided to the Court *in camera*. (Docs. 135 at p. 4; 84; 85).

CONCLUSIONS OF LAW

I.  **Legal Standards**

The FTCA provides a remedy for personal injury caused by the negligent or wrongful act of any government employee acting within the scope of his employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place" where the act occurred. 28 U.S.C. § 1346(b)(1); 2671-2680; *see also United States v. Muniz*, 374 U.S. 150, 153 (1963).

In suits properly brought under the FTCA, the Court applies the law of the state in which the acts or omissions occurred. 28 U.S.C. § 1346(b)(1); *see also Midwest Knitting Mills, Inc. v. United States*, 950 F.2d 1295, 1297 (7th Cir. 1991) ("[T]he FTCA incorporates the substantive law of the state where the tortious act or omission occurred . . . ."). Accordingly, Illinois law governs this case.

Under Illinois law, in a medical malpractice action, a plaintiff bears the burden of proving: "(1) the proper standard of care against which the defendant's conduct is measured; (2) an unskilled or negligent failure to comply with the applicable standard; and (3) a resulting injury proximately caused by the defendant's want of skill or care."

*Morisch v. United States*, 653 F.3d 522, 531 (7th Cir. 2011) (quoting *Petre v. Cardiovascular Consultants*, 871 N.E.2d 780, 790 (Ill. App. Ct. 2007)).

"The standard of care in a medical malpractice case is 'the relevant inquiry by which we judge a physician's actions.'" *Johnson v. United States*, 65 F. Supp. 3d 595, 607 (N.D. Ill. 2014) (quoting *Neade v. Portes*, 739 N.E.2d 496, 502 (Ill. 2000)). "The physician is 'held to the reasonable skill which a physician in good standing in the community would use in a similar case.'" *Id.* "A breach occurs when a physician fails to use 'reasonable skill' that 'physicians in good practice ordinarily use and would bring to a similar case.'" *Id.* at 608 (quoting *Cummings v. Jha*, 915 N.E.2d 908, 920 (Ill. App. Ct. 2009)).

"Proximate cause in a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible." *Morisch*, 653 F.3d at 531 (quoting *Johnson v. Loyola Univ. Med. Ctr.*, 893 N.E.2d 267, 272 (Ill. App. Ct. 2008)). The cause "need not be the only cause, nor the last or nearest cause, of the injury. It is sufficient if it combines with another cause resulting in the injury." *Johnson*, 65 F. Supp. 3d at 615 (quoting Ill. Pattern Jury Instr.-Civ. 15.01 (2009)).

To establish proximate cause, a plaintiff must show cause-in-fact and legal cause. *Morisch*, 653 F.3d at 531. Cause-in-fact exists under Illinois law "when there is a reasonable certainty that a defendant's acts caused the injury or damage." *Id.* (quoting *Coole v. Cent. Area Recycling*, 893 N.E.2d 303, 310 (Ill. App. Ct. 2008)). In other words, the plaintiff must "present expert testimony that shows both that: (1) the defendant deviated from the standard of care" and (2) "that *that* deviation was the proximate cause of the

plaintiff's injury. *Buck v. Charletta*, 994 N.E.2d 61, 72 (Ill. App. Ct. 2013). To prove legal cause, a plaintiff must show that "an injury was foreseeable as the type of harm that a reasonable person would expect to see as a likely result of his or her conduct." *Morisch*, 653 F.3d at 531 (quoting *LaSalle Bank, N.A. v. C/HCA Devel. Corp.*, 893 N.E.2d 949, 970 (Ill. App. Ct. 2008)).

"A defendant has the right not only to rebut evidence tending to show that defendant's acts are negligent and the proximate cause of claimed injuries, but also has the right to endeavor to establish by competent evidence that the conduct of a third person, or some other causative factor, is the sole proximate cause of plaintiff's injuries." *Leonardi v. Loyola Univ. of Chi.*, 168 Ill.2d 83, 101 (Ill. 1995); s*ee also McDonnell v. McPartlin*, 192 Ill.2d 505, 516 (Ill. 2000). For a defendant to argue sole proximate cause "in no way shifts to the defendant the burden of proof." *Leonardi*, 168 Ill. 2d at 94.

## II.    Plaintiff's Objections to Trial Testimony

### A.  *Plaintiff's Objection to the Testimony of Expert Elizabeth Uchtman, RN, BSN*

Elizabeth Uchtman, RN, BSN, was originally produced as Plaintiff's retained expert witness in this case. Plaintiff listed Ms. Uchtman as a witness expected to testify live at trial in her Rule 26(a)(3) disclosure (Doc. 124) and in the Final Pre-Trial Order (Doc. 135). Shortly before trial, however, Plaintiff opted not to call Ms. Uchtman to testify. Plaintiff then objected to the Court's consideration of her pre-trial deposition testimony at trial on the basis of relevance.[8]  (Doc. 140 at pp. 157, 158).

---

[8]  The United States submitted Ms. Uchtman's deposition transcript from these proceedings. (Ex. 111). The parties agreed such submission was appropriate subject to Plaintiff's relevancy objection. (Doc. 140 pp. 157, 158). At trial, the Court noted the apparent relevance of such testimony and conditionally allowed it.

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401.

The Court overrules Plaintiff's relevancy objection. Ms. Uchtman, a former labor and delivery nurse with many years of experience, offered numerous opinions as to how Nurse Lahey violated the standard of care. These opinions related to both the call to Dr. Turner and Nurse Lahey's actions and omissions independent of Dr. Turner. Ms. Uchtman also offered causation opinions, including testimony (to a reasonable degree of medical certainty) that the portion of the EFM strip after the call to Dr. Turner depicted *fetal* heart rate. She further opined that this portion of the strip depicted placental abruption, which the parties agree was the cause of death.

The Court finds the testimony of Ms. Uchtman relevant to Plaintiff's element of causation and the United States' argument of sole proximate cause. The Court further considers Ms. Uchtman's testimony as relevant given Plaintiff's endorsement of her as an expert in obstetrical nursing for more than a year and a half throughout these proceedings. Finally, the Court holds Ms. Uchtman's testimony to be admissible as a statement made by a person whom the opposing party authorized to make a statement on the subject. *See* FED. R. EVID. 801(d)(2)(C); *Clanton v. United States*, Case No. 15-cv-124-NJR-RJD, 2017 WL 2637795, at *12 (S.D. Ill. June 19, 2017). The Court therefore accepts and recognizes her as an expert in labor and delivery nursing.

---

(*Id*. at p. 161).

B.  *Plaintiff's Objection to Dr. Casey Younkin's Criticisms of Nurse Lahey*

Plaintiff maintains Dr. Younkin, an obstetrician, is unqualified to criticize the

nursing conduct of Nurse Lahey and objected accordingly. (Ex. 113, pp. 16, 17). The Court

overrules this objection for two reasons.

First, Federal Rule of Evidence 702 applies to these proceedings, and Rule 702

speaks to a witness qualified as an expert by knowledge, skill, experience, training, or

education. Dr. Younkin extensively testified about his experience as an on-call

obstetrician and his dealings with labor and delivery staff. The Court therefore finds Dr.

Younkin meets Rule 702 as an expert in obstetrical medicine and on-call obstetrical

practice. *See Love v. United States*, 17 F.4th 753 (7th Cir. 2021) (rejecting the notion that

Rule 702 requires a witness to be licensed in a specific medical profession to offer

standard of care testimony). Second, Dr. Younkin's criticisms of Nurse Lahey were timely

disclosed by the United States and were not the subject of any *Daubert* motion by Plaintiff.

Plaintiff's criticism of Dr. Younkin's qualifications should have been raised prior to trial.

For these reasons, the Court overrules Plaintiff's objection and allows Dr.

Younkin's testimony.

C.  *Defendant's Criticism of Dr. Becky Lynn*

While not lodged as a formal objection or raised in a *Daubert* motion, the United

States criticizes Plaintiff's expert, Dr. Lynn, and questions her qualifications as an expert.

The United States points to the fact that Dr. Lynn has not delivered a baby since 2020, has

not practiced obstetrics since 2020, and last attended a Continuing Medical Education

course concerning obstetrics more than 10 years ago. The United States also notes that

nearly 16 years have passed since Dr. Lynn last practiced on-call obstetrics in a manner
similar to the circumstances of this case, *i.e.*, where Dr. Turner saw patients in a clinic
while also on call. Prior to this lawsuit, Dr. Lynn had not previously opined on the
obstetrical standard of care or testified on the subject of preeclampsia.

The Court is not persuaded by the United States' characterization of Dr. Lynn's
experience. Dr. Lynn, a board-certified OB-GYN, practiced obstetrics for 20 years until
January 20, 2020—six months after the events of this case. Dr. Lynn testified that she had
significant experience dealing with preeclampsia, including in her practice at University
of Missouri, Columbia, and Saint Louis University, where she managed many high risk
pregnancies. (Ex. 7 at p. 13). Dr. Lynn also taught a class on preeclampsia to medical
students at the University of Missouri in every rotation. (*Id.* at p. 60). Thus, the Court
finds Dr. Lynn is well qualified to opine on the standard of care and Dr. Turner's breach
thereof.

## III.   <u>Liability</u>

"In a bench trial, a district court judge must act as both gatekeeper and fact finder."
*Madden v. United States Dep't of Veterans Affs.*, 873 F.3d 971, 973 (7th Cir. 2017). The court
may draw reasonable inferences from the evidence and must assess the credibility of
witnesses. *See* FED. R. CIV. P. 52(a). While a district court "need not address each piece of
evidence, the court must include sufficient subsidiary facts so that [the Court of Appeals]
can clearly understand the steps by which it reached its ultimate conclusion." *Xodus v.
Wackenhut Corp.*, 619 F.3d 683, 686 (7th Cir. 2010).

A.  *Phone Call Between Nurse Lahey and Dr. Turner*

The key factual issue involves what transpired during the brief phone call between Nurse Lahey and Dr. Turner on July 23, 2019. Indeed, Nurse Lahey and Dr. Turner offered significantly different versions of the call.

Although she did not have an independent recollection of her call with Dr. Turner, Nurse Lahey testified she would have given him a standard report including the patient's name, physician, number of pregnancies and deliveries, gestational age, and any "findings." She further testified that her Nursing Note, which said, "Dr. Turner called with results," meant she told Dr. Turner the results of the EFM tracing, urinalysis results, blood pressures, and the sterile vaginal exams. She also stated that she would have told Dr. Turner about "all abnormal findings," including the 2+ proteinuria. This is the type of information Nurse Lahey would always report to a physician, every time, as part of her custom.

Dr. Turner, on the other hand, testified that he has a "very clear" recollection of the call because he found out the next morning that Ms. Stackhouse lost her baby and the Labor and Delivery Unit Manager asked him to recount his conversation with Nurse Lahey. According to Dr. Turner, Nurse Lahey told him Ms. Stackhouse was at the hospital for contractions, that her cervix had not changed since arriving, and that her urinalysis "looks like she has a UTI." Dr. Turner testified that he understood Nurse Lahey was calling for a labor check, and that Nurse Lahey did not tell him anything about Ms. Stackhouse's vital signs, blood pressure readings, the EFM strip, or any specific information about the urinalysis except that she had a UTI, which is why he prescribed

an antibiotic.

Having listened to the testimony at trial, the Court credits Dr. Turner's version of the call over Nurse Lahey's testimony regarding her habit.[9] First, the Court notes that Nurse Lahey had no independent recollection of the phone call, which is not surprising given that the call took place almost six years before trial. And, of course, the nature of a labor and delivery nurse's daily tasks involves numerous daily telephone calls with physicians. Moreover, Nurse Lahey was unaware that Ms. Stackhouse had any problems until she was served with the lawsuit two years after C.M.'s death.

The Court also notes that in July 2019, Nurse Lahey was relatively inexperienced—she had been an OB nurse for less than two years. It is entirely possible that the "habit" to which she referred, if it is one, is something developed in the years since her encounter with Ms. Stackhouse. Furthermore, there were discrepancies in Nurse Lahey's testimony; while she testified she has no independent recollection of the phone call with Dr. Turner, she did claim to have a clear memory that Ms. Stackhouse vomited after the phone call.

Finally, Nurse Lahey's testimony does not comport with her own contemporaneous note about the call. Nurse Lahey testified she recognized the importance of charting and continuity of care. Yet, the note, authored minutes after Ms. Stackhouse left the hospital, does not mention Ms. Stackhouse's prior medical history of

---

[9] Federal Rule of Evidence 406 allows a person's habit to be admitted to prove that the individual acted in accordance with the habit. "[B]efore a court may admit evidence of habit, the offering party must establish the degree of specificity and frequency of uniform response that ensures more than a mere 'tendency' to act in a given manner, but rather, conduct that is 'semi-automatic' in nature. *Simplex, Inc. v. Diversified Energy Sys., Inc.*, 847 F.2d 1290, 1293 (7th Cir. 1988). Here, there is no evidence to support Nurse Lahey's conduct as "semi-automatic" in nature.

preeclampsia, reports of extreme pain, vital signs (including elevated blood pressure readings), proteinuria, tachysystole, fetal heart rate decelerations, or inadequate or broken tracing on the fetal monitoring strip. Nor does the note mention any of these items were communicated to Dr. Turner.

Thus, the Court finds Nurse Lahey's testimony regarding the phone call is not entirely credible.

B. *Dr. Turner Breached the Standard of Care*

Having credited Dr. Turner's version of the phone call, the Court turns to the information Dr. Turner gained during the call. According to Dr. Turner, Nurse Lahey told him Ms. Stackhouse was there for contractions, her cervix had not changed after being checked twice, and, based on her urinalysis, it "looks like she has a UTI." Dr. Turner then formulated a differential diagnosis: is Ms. Stackhouse in labor, and does she have a UTI. He concluded that no, she was not in labor, and yes, she had a UTI.

According to Dr. Lynn, whose testimony the Court finds credible, Dr. Turner's reliance on Nurse Lahey's diagnosis of a UTI was a violation of the standard of care. While Dr. Lynn acknowledged that Dr. Turner could rely upon the nursing staff to inform him of abnormal vital signs and lab results, in this case, that did not happen. Nurse Lahey told Dr. Turner that it looked like Ms. Stackhouse had a UTI, and he accepted that diagnosis without any further investigation. Dr. Lynn testified that Dr. Turner was obligated to inquire further and make his own assessment based on the lab results instead of allowing Nurse Lahey to make the diagnosis. Even if Dr. Turner had simply asked about Ms. Stackhouse's blood pressure, Dr. Lynn testified, that alone would have been

enough for Dr. Turner to order further workup. Instead, Dr. Turner "took the diagnosis
made by [Nurse Lahey], didn't ask for any more information to make his own diagnosis,
and ultimately missed a major diagnosis."[10] This, Dr. Lynn explained, was a violation of
the standard of care.

Dr. Lynn's testimony that only a doctor, not a nurse, may make a diagnosis is
supported by the United States' nursing expert, Elizabeth Uchtman, RN, BSN, who
testified that the plan of care for each patient—and a diagnosis—is determined by the
physician. While Ms. Uchtman testified that she did not know exactly what Nurse Lahey
reported to Dr. Turner about the urinalysis results, she assumed Dr. Turner had
diagnosed a UTI since he had prescribed medication.

The United States frames the standard of care as requiring Dr. Turner to determine
whether Ms. Stackhouse was in labor and "to respond to the UTI." Thus, the United States
seems to acknowledge that Dr. Turner did not himself diagnose the UTI, but merely
"responded" to it by prescribing Macrobid. Indeed, Dr. Turner's own testimony verifies
that he failed to independently diagnose Ms. Stackhouse with a UTI, instead relying on
Nurse Lahey's diagnosis. Dr. Turner admitted that Nurse Lahey "told me that the patient
had a UTI." When asked whether "Nurse Lahey came up with the diagnosis, not you,"
Dr. Turner responded that "[s]he suggested one, yes." (Doc. 140 at p. 214). Dr. Turner
then stated he did not come up with an independent diagnosis because "what she

---

[10] According to Dr. Lynn, it is not even clear that Ms. Stackhouse actually had a UTI because the "catch"
wasn't clean. It showed epithelial cells "suggestive of contamination" (AMH 0020) and was negative for
nitrites (AMH 0021). (Ex. 7, pp. 52-53). Dr. Lynn testified that the only definitive way to say that
Ms. Stackhouse had a UTI is with a culture, which wasn't performed. (*Id.*). Instead of confirming the patient
had a UTI, Dr. Turner simply prescribed an antibiotic. (*Id.*).

presented was consistent." (*Id.*). There is no indication as to what Nurse Lahey's

diagnosis was "consistent" with, considering Dr. Turner did not have any lab results to

review. Indeed, Dr. Turner never reviewed the labs or asked Nurse Lahey about them.

After initially testifying that Nurse Lahey "suggested" a diagnosis, Dr. Turner

then acknowledged he allowed Nurse Lahey to make the diagnosis:

> Q.    So, just so I understand this, Doctor, Nurse Lahey took the history,
> Nurse Lahey examined the patient, Nurse Lahey did the differential
> diagnosis, she ran the tests, she reviewed the results, she reached the
> diagnosis, you said, "Give her an antibiotic," she reviewed the strips,
> she asked the questions, and you provided no information.
>
> . . .
>
> A:    I would say she has the gathering of information. I am the one who
> has to decide what to do with the information, the treatment of the
> urinary tract infection and letting the patient go because she had not
> shown signs of active labor.
>
> Q.    So, she told you it was a urinary tract infection and you went along
> with it, right?
>
> A.    Yes.
>
> Q.    You did no independent inquiry, correct?
>
> A.    I did not search for the urinary tract infection . . . I did not try and go
> and find the urinalysis results independently, no, sir.
>
> Q.    Did you do anything to confirm this was, in fact, a urinary tract
> infection and not some other circumstance like preeclampsia,
> correct?
>
> A.    I did not.

(Doc. 140 at pp. 215-16).

Dr. Turner also testified that a reasonably careful doctor would not ask "What's

the blood pressure?" because "[i]n the absence of an abnormality, I'm not going to just

start asking questions about lots of things that the nurse did not present." (*Id.* at p. 217). But in this case, there *was* an abnormality that the nurse presented to Dr. Turner: the presence of some abnormal test result that caused Nurse Lahey to think Ms. Stackhouse had a UTI. Thus, his failure to ask additional questions of Nurse Lahey is a violation of Dr. Turner's own definition of the standard of care.

The Court gives little, if any, weight to the standard of care opinions of Dr. Casey Younkin, the United States' retained expert in obstetrics and on-call obstetrical practice. Dr. Younkin testified that Dr. Turner did not violate the standard of care with respect to Ms. Stackhouse because a reasonably careful doctor does not need to ask the nurse for any significant positive test results or look at the patient's chart. (*Id.* at p. 82). Instead, he stated, a nurse is permitted to "collect information" and "make conclusions." (*Id.* at p. 60). Dr. Younkin testified that a registered nurse *can* make a diagnosis (*id.* at p. 76), and Dr. Turner relied on Nurse Lahey's diagnosis of a UTI (*id.* at p. 90). The Court finds this testimony unreliable, as it is contradicted by the testimony of every other fact and expert witness in this case other than Dr. Turner. Even Dr. Younkin somewhat backtracked later in his testimony, claiming that Dr. Turner did make a diagnosis because "he could go along with the diagnosis that [Nurse Lahey] made and, thus, you know, make a diagnosis also or share in the diagnosis." (*Id.* at p. 77).

Based on the credible testimony offered at trial, the Court finds that Dr. Turner violated the standard of care when he allowed Nurse Lahey to diagnose Ms. Stackhouse with a UTI, failed ask what information led Nurse Lahey to believe Ms. Stackhouse had a UTI, and failed to independently diagnose Ms. Stackhouse with a UTI.

C.    _Proximate Cause_

Having determined that Dr. Turner violated the standard of care, the Court must now determine whether that breach of the standard of care was a proximate cause of the damages claimed by Ms. Stackhouse. The Court concludes that it was as to the wrongful death claim in Count II.

Plaintiff presented expert testimony from Dr. Lynn that, had Dr. Turner inquired about the urinalysis results, he likely would have admitted Ms. Stackhouse to the hospital and ordered additional lab work. (Ex. 7 at p. 48). And if Ms. Stackhouse had been admitted and additional testing done, Dr. Lynn testified, C.M. would have been born without complication. (_Id_. at p. 55). She further testified, to a reasonable degree of medical certainty, that the failures of Dr. Turner resulted in the death of C.M. (_Id_.).

The United States' own expert, Dr. Younkin, also testified that had Dr. Turner received information about the proteinuria and blood pressure readings, Dr. Turner would have kept the patient longer. (Ex. 113 at p. 56). Dr. Younkin also testified that had Dr. Turner kept Ms. Stackhouse at the hospital, it is more probably true than not that there would have been a different outcome for C.M. and Ms. Stackhouse. (_Id_.).

Moreover, Dr. Turner himself testified that had he known about the 2+ protein, he would have said, "Well, what are her blood pressures?" (Doc. 140 at p. 185). In other words, if Dr. Turner had diagnosed the UTI himself by requesting the urinalysis results or simply asking Nurse Lahey why she thought Ms. Stackhouse had a UTI—rather than allowing Nurse Lahey to independently diagnose the UTI—he would have then asked about Ms. Stackhouse's blood pressure readings. Dr. Turner testified that if he had known

there was 2+ protein *and* elevated blood pressure readings, he would have ordered a series of preeclampsia labs. (*Id.* at pp. 186, 204).

Finally, C.M.'s death was a reasonably foreseeable result of Dr. Turner's failure to ask Nurse Lahey why she thought Ms. Stackhouse had a UTI, independently diagnose Ms. Stackhouse with a UTI based on the results of the urinalysis, and order additional lab work based on those results. The Court finds, based on the testimony of Dr. Lynn, Dr. Younkin, and Dr. Turner himself that if Dr. Turner had sought the information required for him to independently diagnose Ms. Stackhouse with a UTI, he would have had admitted Ms. Stackhouse and additional testing would have been done. And the expert testimony establishes that had Ms. Stackhouse been admitted for additional testing, C.M. would have been born without complications.

Having found that Dr. Turner was negligent and that his negligence was a proximate cause of C.M.'s death, the Court rejects Dr. Turner's defense that Nurse Lahey was the sole proximate cause of Ms. Stackhouse's damages. While there is absolutely no doubt that Nurse Lahey was negligent in her treatment of Ms. Stackhouse, that fact does not absolve Dr. Turner of liability. If Dr. Turner had adhered to the standard of care and asked the pertinent questions required for him to make his own diagnosis of a UTI, he would have admitted Ms. Stackhouse and ordered additional lab work. Nurse Lahey would not have let Ms. Stackhouse leave the hospital, and it is more likely than not that C.M. would have lived. Dr. Turner's "failure to render care as a reasonably careful physician" was at least a contributing cause of C.M.'s death. *See Johnson*, 65 F. Supp. 3d at 618. "That is sufficient under Illinois law to satisfy the proximate cause element." *Id.*

The same cannot be said, however, for Ms. Stackhouse's claim of medical malpractice and personal injury in Count I. Plaintiff introduced no medical records supporting a claim of any physical injury to Ms. Stackhouse subsequent to Dr. Turner's involvement, nor did she present any fact witnesses to testify about her medical condition other than her own testimony about severe pain that continued as she left AMH. Moreover, Illinois law requires expert testimony on proximate cause to sustain a medical malpractice claim. *See Morisch*, 653 F.3d at 531. Plaintiff elicited no expert testimony linking any alleged negligence of Dr. Turner to any personal injury of Ms. Stackhouse. Plaintiff's retained expert, Dr. Lynn, did not opine as to whether Ms. Stackhouse suffered physical injury as a result of Dr. Turner's care, and she did not suggest Ms. Stackhouse's treatment or physical condition would have been different had she stayed at AMH.

Simply stated, there is scant, if any, foundation to support Ms. Stackhouse's alleged personal injury. Given the dearth of evidence of personal injury to Ms. Stackhouse, the Court finds that Plaintiff has not established causation as to Count I.

## IV.    <u>Damages</u>

The Court finds that as a result of Dr. Turner's negligence, Ms. Stackhouse and the Estate of C.M. sustained significant damages.

"Illinois law allows parents to recover for the wrongful death of a fetus." *In re Est. of Poole*, 799 N.E.2d 250, 259 (Ill. 2003) (citing *Seef v. Sutkus*, 583 N.E.2d 510 (Ill. 1991)). Indeed, the Illinois Supreme Court has recognized a rebuttable presumption for loss of society exists for the wrongful death of a stillborn child. *Id.* "Under Illinois law, 'the jury may give such damages as they shall deem a fair and just compensation with reference

to the pecuniary injuries resulting from such death, including damages for grief, sorrow, and mental suffering, to the surviving spouse and next of kin of such deceased person.'" *Johnson*, 65 F. Supp. 3d at 619 (quoting 740 ILCS 180/2).

In assessing the amount of damages to award, the Court must consider the damages awarded in comparable cases. *Jutzi-Johnson v. United States*, 263 F.3d 753, 759 (7th Cir. 2001). The Court also must consider how long C.M.'s next of kin will be likely to sustain pecuniary losses as a result of his death, considering how long C.M. was likely to have lived and how long his next of kin are likely to live. *Johnson*, 65 F. Supp. 3d at 619 (citing Ill. Pattern Jury Instr.-Civ. 31.13 (2012)).

A. *Comparable Cases*

The United States has suggested that the Court follow *Johnson*, a case from the Northern District of Illinois involving the death of a full-term fetus. 65 F. Supp. 3d at 599. After extensively recounting the mother's course of treatment, the *Johnson* court determined the medical staff failed to adequately monitor, evaluate, and diagnose various abnormalities and indicators of fetal distress, which resulted in uterine rupture and caused the baby's death. *Id*. at 616.

To appropriately calculate an award of damages for the next of kin, the *Johnson* court considered a variety of comparable cases and recognized the difficulties in evaluating verdicts and judgment data, as certain variables remain unknown. *Id*. at 620-21. These variables include the number of next of kin considered in the total award, how the court allocated the award, and how the specific circumstances of each case factored

into each award. *Id.* at 621. Such concerns exist here as well, where Ms. Stackhouse's grief, sorrow, and mental suffering are at issue.

The *Johnson* court determined it was appropriate to focus on cases involving "a seemingly-preventable death of a baby—either a stillborn or a baby that was born alive but passed away a short time later." *Id.* at 622-23. Ultimately, the court awarded a total of $1.5 million in damages,[11] with $750,000 representing the mother's loss, $300,000 representing the father's loss, $150,000 each for three half-siblings, and $0 for three half-siblings who did not live near the decedent's anticipated residence. *Id.* at 625.

The district court in *Johnson* provided a meticulous discussion and breakdown of damages in the context of an FTCA claim for fetal death. Accordingly, the Court finds *Johnson* instructive here.

### Other Cases

In addition to *Johnson*, the Court also considers other Illinois cases involving stillborn babies whose deaths seemingly could have been prevented, some of which were offered by the United States (with additional information supplemented by the Court), and some of which were located by the Court.

In *Beverly v. United States*, an expectant mother was admitted to a hospital at 32 weeks with shortness of breath and a cough, later diagnosed as pneumonia. Although a nurse allegedly told the doctor of the mother's worsening condition, the doctor did not examine her. She was subsequently found unresponsive in her hospital room and

---

[11] Notably, $1.5 million dollars in September 2014 equates to $2,046,792,22 in September 2025. *See* https://www.bls.gov/data/inflation_calculator.htm (last accessed Nov. 18, 2025). Unfortunately, the United States did not adjust any of the damages awards in the cases it offered for comparison for inflation.

ultimately pronounced dead. Medical staff attempted to deliver her unborn child via

emergency C-section, but the child was stillborn. *Beverly v. United States*, No. 12-cv-07234,

2016 WL 7330909 (N.D. Ill. May 10, 2016). The jury awarded a total of $9 million for both

the death of the mother and the baby. The heirs then agreed and signed a consent to

distribution, with the father and husband receiving 33 percent and each of the six

children/siblings receiving 11 percent. *See id.* at Doc. 204, 209.

The United States also points to *Iniestra v. Silva*, 2014 WL 5448893 (Ill. Cir. Ct. Cook

Cty. 2014), a wrongful death action brought when a fetus reportedly suffered intrauterine

growth restriction due to placental insufficiency, became hypoxic, and was stillborn.

Plaintiff contended the defendants negligently failed to timely order a Level II

ultrasound, failed to monitor and timely deliver the baby, and failed to refer the mother

to a maternal-fetal specialist for monitoring and timely delivery. The baby was survived

by her mother, father, and minor sister. The jury awarded a total of $525,000, allocated as

$375,000 to the mother, $100,000 to the father, and $50,000 to the minor sibling.

In *Lockhart v. Overbeck*, 2014 WL 3916626 (Ill. Cir. Ct. Cook Cty. 2014), a jury

awarded a total of $2,900,000 after an employee of ASAP Perinatal Nurse Staffing

Solutions Inc., among other things, failed to recognize the signs and symptoms of uterine

rupture, improperly monitored the mother, failed to recognize that the baby was in fetal

distress, failed to appreciate the significance of uterine tachysystole in the mother, failed

to recognize the significance of disproportionate pain to the state of labor and fetal

monitoring findings, and failed to timely read and interpret fetal monitoring strips. The

award was not allocated individually amongst next of kin, but instead as follows:

$1,000,000 for past loss of society, $500,000 for future loss of society, $1,000,000 for past grief, sorrow, and mental suffering, and $400,000 for future grief, sorrow, and mental suffering.

In 2012, a jury awarded $2,250,000 for a wrongful death claim as well as a claim under the Illinois Survival Act for the baby's conscious pain and suffering after his birth (and prior to his death) in *Novak v. Advocate Health & Hosps.*, 2012 WL 7997391 (Ill. Cir. Ct. Cook Cty. 2012). In that case, after the mother was admitted to the hospital for abdominal pain, she claimed doctors failed to diagnose her severe preeclampsia and nurses failed to recognize her signs and symptoms of HELLP syndrome, including right upper quadrant pain, nausea, vomiting, hypertension, elevated liver enzymes, and an elevated uric acid level. The plaintiff also claimed the doctors failed to timely perform an emergency C-section. It is unknown if the award was allocated between the wrongful death and survival claims or between the mother and father as next of kin.

In *Thigpen v. Bray*, 2012 WL 3195238 (Ill. Cir. Ct. Cook Cty. 2012), an expectant mother was admitted for induction of labor, but her child died at or near the time of delivery. The plaintiff alleged the OB-GYN failed to properly monitor the EFM tracings, failed to recognize signs of acute utero-placental insufficiency and fetal distress, and failed to timely perform a C-section. The plaintiff also alleged that nurses at the hospital failed to monitor her, failed to recognize a deteriorating fetal heart pattern, and failed to inform the OB-GYN about her status, including bleeding in a patient suffering from hypertension or preeclampsia. The estate brought a wrongful death action against the

doctor and the hospital, with the latter settling prior to trial for $875,000. A jury then awarded $350,000 in damages against the OB-GYN.

In November 2007, a jury awarded $1,250,000 for the wrongful death of a baby in Cook County, Illinois. *McGee v. Advocate Health & Hosps.*, 2007 WL 6066111 (Ill. Cir. Ct. Cook Cty. 2007). There, a mother was seven months pregnant and experiencing a variety of symptoms, including nausea, headache, pain, and swelling. After being seen by the defendant hospital and doctor, she was diagnosed with a UTI and sent home. Roughly 36 hours later, she was diagnosed with placental abruption and delivered a stillborn child. The plaintiff contended that defendants failed to provide an adequate staff with the skill and knowledge necessary to properly diagnose and treat the symptoms of preeclampsia. The plaintiff further contended that defendants failed to perform the proper diagnostic testing, negligently discharged a high-risk patient, and failed to provide the proper standard of care. In addition to the wrongful death action on behalf of the child's estate, the plaintiff also asserted a personal injury claim on behalf of the mother. The mother alleged that she suffered seizures, a stroke, and cardiomyopathy after she was first discharged from the hospital. The jury awarded the mother an additional $550,000 for her pain and suffering.

In *Sanchez v. Womancare S.C.*, 2007 WL 5187816 (Ill. Cir. Ct. Cook Cty. 2007), an expectant mother presented to a hospital for treatment for bleeding and back pain but was discharged. The child was later stillborn due to a placental abruption. The plaintiff filed a wrongful death action against the hospital and doctor, alleging failure to properly monitor, treat, and diagnose. The next of kin included the child's parents. The jury

awarded $1,650,000 in non-economic damages and $1,166 for funeral expenses.

In *Miller v. Edward Hospital*, 2010 WL 4673971 (Ill. Cir. Ct. DuPage Cty. 2012), a jury awarded $1 million for the wrongful death of a fetus. There, the expectant mother presented to an emergency room at 14-weeks pregnant with complaints of abdominal pain, nausea, and vomiting. During her admission to the hospital, the unborn child died in utero. The mother was also found to require a bowel resection due to necrotic intestines with 720-degree torsion. A second surgery was required to address these issues, after which she spontaneously delivered her unborn child. The plaintiff brought a wrongful death claim on behalf of the unborn child, in addition to claims for personal injury to the mother, past and future medical expenses, and loss of consortium. The next of kin for the child included the mother and father. The jury separately awarded $10.5 million for the mother's personal jury claims. The Court notes *Miller* is factually dissimilar to the facts of Ms. Stackhouse's case, although it does involve the wrongful death of an unborn child.

In *Valdovinos v. Sauer*, 2006 WL 4591458 (Ill. Cir. Ct. Will Cty. 2006), the plaintiff alleged the OB-GYN overseeing her prenatal care failed to provide insulin medication and to perform related testing. The fetus died in utero and was stillborn at nearly full term. The next of kin included the mother, father, and a sister. The jury awarded a total of $450,000, although allocation amongst the next of kin is unknown.

Finally, the Court considers several wrongful death cases that ended in settlement. While settlement allows the parties to resolve their dispute by compromise, thereby avoiding the risks associated with trial, the Court still finds these cases useful for various reasons.

For example, in *Vazquez v. United States*, No. 1:19-CV-04793 (N.D. Ill. 2021), the parties settled for $1,750,000 in a case involving employees of the United States. The plaintiff asserted that the physicians, acting within the scope of their employment with the United States, were negligent in failing to re-evaluate the progression of labor, or request re-evaluation, and in failing to properly manage shoulder dystocia. The baby was stillborn as an alleged result of the physicians' conduct.

In *Hill v. Northshore University Health System*, No. 1912120025, 2019 WL 6781230 (Ill. Cir. Ct. Cook Cty. 2019), a baby was stillborn a day after the mother presented for labor and delivery. The plaintiff claimed the defendants failed to appreciate and act on evidence of chorioamnionitis in the mother and fetal tachycardia and decelerations in the baby. The plaintiff claimed that the baby would have survived if it had been delivered by C-section sooner. The parties reached a total settlement of $2,100,000, which was divided equally amongst the mother and father after attorneys' fees were deducted.

In *Varacel v. United States*, No. 1:16-CV-05852, 2017 WL 3193477 (N.D. Ill. 2017), a baby was stillborn after the OB-GYN allegedly failed to adequately and completely test the mother for gestational diabetes and notice the symptoms of gestational diabetes. The defendant claimed affirmative defenses including the failure to timely present an administrative claim and the statute of limitations. The parties entered into a settlement for $500,000. The minor was survived by his parents and six minor siblings, four of whom were alive at the time of the death and were eligible beneficiaries. Because no agreement could be reached regarding the proper allocation of the proceeds, the net proceeds were to be determined in accordance with dependency determinations following a hearing in

Cook County.

Finally, in *Torres v. Olabi*, 2012 WL 3870584 (Ill. Cir. Ct. Kane Cty. 2012), a fetal

medicine specialist recommended that the plaintiff receive biweekly non-stress tests and

weekly amniotic fluid index assessments, but there was no indication that the plaintiff's

OB-GYN conducted the recommended tests. Weeks later, the baby was stillborn. The

parties settled for $900,000. After deducting attorney fees and costs, $491,738.51 was

allocated for the mother and $163,912.84 was deposited into an annuity for a sibling's

benefit.

A summary chart of the foregoing, adjusted for inflation, is as follows:

| Case Name | Verdict / Settlement | Date of Award | Adjusted for Inflation |
|---|---|---|---|
| *Beverly* | $3,164,160 | May 2016 | $4,278,081.20 |
| *Vasquez* | $1,750,000 | June 2021 | $2,092,044.05 |
| *Hill* | $2,100,000 | March 2019 | $2,683,220.43 |
| *Varacel* | $500,000 | April 2017 | $664,147.49 |
| *Iniestra* | $525,000 | August 2014 | $716,916.40 |
| *Lockhart* | $2,900,000 | May 2014 | $3,959,310.63 |
| *Novak* | $2,250,000 | October 2012 | $3,159,300.87 |
| *Torres* | $900,000 | July 2012 | $1,275,927.09 |
| *Thigpen* | $350,000 | March 2012 | $495,570.90 |
| *Miller* | $1,000,000 | October 2010 | $1,485,064.77 |
| *McGee* | $1,250,000 | November 2007 | $1,931,705.18 |
| *Sanchez* | $1,650,000 | May 2007 | $2,577,170.36 |
| *Valdovinos* | $450,000 | October 2006 | $724,281.47 |
| **Average Award** | | | **$2,003,287.75** |

A. *Individual Awards*

Based on the evidence presented, C.M. left four individuals as his next of kin[12]: his

mother, Shantela Stackhouse; his father; and two half-siblings alive at the time of the loss,

---

[12] "'Next of kin' are those blood relatives of the decedent who are in existence at the time of the decedent's

Arrieiona, now age 20, and Dontrele, now age 17. Plaintiff, however, presented limited evidence regarding the grief, sorrow, or mental suffering of anyone other than Ms. Stackhouse herself. None of the other next of kin testified at trial, and C.M.'s father was not mentioned during the trial.

### 1.  Shantela Stackhouse

Ms. Stackhouse described her preparations during pregnancy for the birth of C.M., and the grieving process since her loss. During her pregnancy, she undertook extensive preparations to ensure the optimal health of her unborn baby. She exercised, ate well, and attended 14 prenatal visits. She spent time preparing her home for a newborn baby.

As mentioned above, Ms. Stackhouse testified that C.M.'s death has affected her relationship with her other children. When she first arrived home, she was "a mess" and tried to think of things that she could have done differently to keep him alive and well. When she was later pregnant with "Z," she did not know if she should be happy or terrified because of what she went through, and thus she was not able to enjoy that pregnancy as she did the others. Not surprisingly, every July 23 has been hard on Ms. Stackhouse.

The excitement that drove preparations for a healthy pregnancy and setting up the house for the arrival of a new baby was destroyed within hours of being discharged from the hospital. Her grief revisits her every year on the anniversary of C.M.'s death. The Court found her testimony about her loss and corresponding grief palpable. Accordingly,

---

death who would take the decedent's property if the decedent had died intestate." *Johnson v. Provena St. Therese Med. Ctr.*, 778 N.E.2d 298, 305 (Ill. App. Ct. 2002).

the Court finds that Ms. Stackhouse is entitled to compensation in the amount of $2,000,000. The Court finds this amount to be comparable to other cases involving the seemingly preventable death of a child, as set forth above.

### 2.  Arrieiona and Dontrele

Although Ms. Stackhouse's daughter and son, Arrieiona and Dontrele, did not testify at trial, Ms. Stackhouse testified that both of her children were at the hospital with her when these events occurred. Both children saw C.M. after he was stillborn. (Doc. 140 at p. 135). Her daughter, Arrieiona, who was 14 or 15 at the time, was the one who called 911 when Ms. Stackhouse woke up at home and could barely move. Her son, Dontrele, who was 11 at the time, called Ms. Stackhouse while she was still in the hospital after C.M.'s death. (*Id.*). He was crying and said "Mom, I know a way they can save him." (*Id.*). Dontrele said he had seen a YouTube video "where they could try to cut his chest open, take the heart out and shock him or something." (*Id.*). Ms. Stackhouse had to tell Dontrele that C.M. was "already gone." (*Id.*). Additionally, C.M. would have lived in the same home with Arrieiona and Dontrele, and evidence as to whether the siblings would have lived in the same home with the decedent may be a relevant consideration. *Johnson*, 778 N.E.2d at 308 (Ill. App. Ct. 2002). There is no reason to doubt that Arrieiona and Dontrele have suffered grief, sorrow, and mental suffering as a result of C.M.'s death. Thus, the Court finds they are entitled to compensation in the amount of $100,000 each.

### 3. C.M.'s Father

No evidence was presented at trial as to the identity of C.M.'s father or any grief, sorrow, or mental suffering he endured. Therefore, the Court finds he is entitled to no compensation.

### B. *Setoff*

As a final matter, the parties have stipulated "the United States is entitled to and will be granted a setoff with regard to the confidential settlement paid by Alton Memorial Hospital in the full amount previously provided to the Court *in camera*." (Doc. 135 at ¶ 25). The Court previously ordered Plaintiff to disclose the confidential settlement to the United States under "an attorney's eyes only" designation to ensure it would not be revealed in the public record. (Doc. 94).

Because the Court is required to issue its findings of fact and conclusions of law in full, pursuant to Federal Rule of Civil Procedure 52(a), and the amount of that settlement is confidential, the Court will address the setoff by separate order. To facilitate this, the Court **DIRECTS** the United States to file a motion under seal requesting application of the setoff amount and entry of a sealed judgment, reflecting the appropriate amount of the setoff to the United States, on or before **December 5, 2025**.

### CONCLUSION

For these reasons, the Court finds that the negligence of Dr. Geoffrey Turner, a deemed federal employee of the United States of America, was a proximate cause of the death of C.M. The Court further finds that Shantela Stackhouse, Individually and as Independent Administrator of the Estate of C.M., is entitled to total damages in the

amount of **$2,200,000.00**.  Ms. Stackhouse is further awarded her costs.

**IT IS SO ORDERED.**

**DATED:   November 21, 2025**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**